**WO**  NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Steven Morales, *et al.*, | No. CV-14-08110-PCT-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

At issue is Defendant United States' Motion to Dismiss Plaintiffs' Complaint and/or for Judgment on the Pleadings (Doc. 36, MTD), to which Plaintiffs Steven Morales and Nicole Perry, Co-Personal Representatives of the Estate of Raymond Perry, and Chopper II, LLC filed a Response (Doc. 46, Resp. to MTD) and the United States filed a Reply (Doc. 48, Reply to MTD). Also at issue is Plaintiffs' Motion for Partial Summary Judgment (Doc. 37, MSJ), to which the United States filed a Response (Doc. 44, Resp. to MSJ) and Plaintiffs filed a Reply (Doc. 49, Reply to MSJ). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f).

**I.    BACKGROUND**

On June 30, 2012, a helicopter piloted by Raymond Perry was flying over the Prescott National Forest, which is located in Arizona and managed by the United States Forest Service ("USFS"), when it struck an unmarked cable that the United States Geological Survey ("USGS") had hung across the Verde River canyon in 1934 as part of a stream-gaging cableway. The helicopter's impact with the cable caused the helicopter to crash in the canyon, killing Mr. Perry and all three passengers. The unmarked cable

spanned about 300 feet across the Verde River canyon and was about 40 feet above the low-flow water surface, and the cable's location did not appear on the aeronautical charts available to pilots. The rock walls on either side of the canyon rise about 200 feet above the river.

On June 30, 2014, Plaintiffs, comprised of Steven Morales and Nicole Perry—Raymond Perry's children and the representatives of his estate—and Chopper II, LLC—a limited liability company that owned the helicopter and is part of Mr. Perry's estate—filed a Complaint against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-80 ("FTCA"), for wrongful death and property damage based on the USGS's placement of the cable (or cableway) across the canyon with no marking. (Doc. 1, Compl. ¶¶ 1-4.) On January 15, 2016, at the parties' request, the Court bifurcated the discovery in this matter, with Phase 1 discovery to focus on the United States' theories of sovereign discretionary immunity and preemption, and Phase 2 discovery, if needed, to focus on the remaining issues. (Doc. 31.) Having reached the end of Phase 1 discovery, the United States has filed a Motion to Dismiss Plaintiffs' Complaint and/or for Judgment on the Pleadings, and Plaintiffs have filed a Motion for Partial Summary Judgment, both asking the Court to resolve whether Plaintiffs' claims are barred by the doctrine of sovereign discretionary immunity or preempted by federal regulations.

### A. FAA Regulations on Marking Obstructions to Airspace

The Federal Aviation Administration ("FAA") prescribes rules to govern all aviation activities in the United States, which are known as the Federal Aviation Regulations ("FARs") and contained in Title 14 of the Code of Federal Regulations ("CFRs"). FAR Part 77 regulates obstructions to air navigation and sets forth the requirements for providing notice to the FAA of certain types of construction or alteration of structures in navigable airspace. 14 CFR § 77.9. Notice must be provided to the FAA for any construction or alteration that is more than 200 feet above ground level or at lower levels within certain distances from an airport or heliport. *Id.*

**B. USGS Policy on Marking Cables**

The USGS maintains policies for marking its cableways. Dr. James Leenhouts is currently the Director of the USGS Arizona Water Science Center and was the Associate Director of Investigations at the time of the accident. (Doc. 36, Ex. C, Declaration of James Leenhouts ("Leenhouts Decl.") ¶ 1.) He stated that "[t]wo functionally consistent expressions of USGS policy regarding marking of cableways were in effect at the time of the accident"—Water Resources Division Policy Memorandum ("WRD") 2000.13, and Survey Manual ("SM") 445-2-H Chapter 2, accompanied by Appendix 27-8. (Leenhouts Decl. ¶ 13.) According to these documents, the Verde River cableway did not require an FAA aeronautical study for marking because it was lower than 200 feet above the ground. (Leenhouts Decl. ¶ 16.)

USGS headquarters-level upper management has revisited its policy for marking cableways several times, usually in response to wire-strike accidents involving cableways. (Leenhouts Decl. ¶ 17.) At each reconsideration, USGS officials "balanced social, economic, and political considerations in an effort to establish national policies for marking cables that would be most effective in ensuring public safety." (Leenhouts Decl. ¶ 17.)

In 2000, USGS Safety Specialist William Simonds met Air Space Specialist Ted Melland for advice on whether cableways placed over rivers in Washington state should be marked. (Leenhouts Decl. ¶ 20.) Mr. Melland reviewed photographs of the cableways and an FAA aeronautical chart and recommended against marking any of the cableways because none of them met FAA obstruction marking criteria. (Leenhouts Decl. ¶ 20.) Mr. Melland "also advised that routine marking of cableways that do not meet the Part 77 marking criteria could potentially have harmful effects to pilots who expect to see obstruction markers only at higher levels." (Leenhouts Decl. ¶ 20.) After the meeting, the USGS issued a new policy—WRD 2000.13—that superseded the prior policy—WRD 84.57. (Leenhouts Decl. ¶ 21.)

As part of its cableway inspection process, USGS's cableway inspection form asks two questions about aircraft warning markers—whether a warning marker is required and whether one is in place. (Leenhouts Decl. ¶ 27.) The form, depending on the version, cites to WRD 2000.13 or SM 445-2-H for guidance, both of which contain identical guidelines in this context and do not require marking of cables lower than 200 feet above ground. (Leenhouts Decl. ¶ 27.) The inspector's assessment whether aerial markers are required is not the final decision on the matter. (Leenhouts Decl. ¶ 28.)  Rather, any issues an inspector notes "are elevated to the management of the Center for final decision." (Leenhouts Decl. ¶ 28.) The USGS balances a variety of factors when determining whether or not to mark a cableway, and many of those factors are site-specific. (Leenhouts Decl. ¶ 32.)

### 1.    WRD 2000.13

Water Resources Division Policy Memorandum No. 2000.13, dated September 19, 2000, specifically addresses the USGS's policy on the use of aircraft-warning markers at cableways. (Leenhouts Decl., Ex. 2, WRD 2000.13.) WRD 2000.13 recognizes that the FAA has sole authority to set obstruction-marking standards and explains that it is WRD's policy to comply with FAA requirements regarding use of aircraft warning markers on cableways because "Congress has charged the FAA with the responsibility to promote the safety of aircraft and the efficient use of navigable airspace." WRD 2000.13 notes that the FAA's regulations for evaluating potential obstructions are found in FAR Part 77 and that, under this regulatory framework, the FAA makes recommendations on marking structures that are considered obstructions. For unmarked cableways already in existence at the time WRD 2000.13 was issued, the policy required that the USGS District Chiefs verify to the Regional Hydrologist within six months of the implementation of the policy that no cableways were over 200 feet above ground or within 20,000 feet of an airport or 5,000 feet of a heliport, such that FAA regulations would ordinarily require marking. WRD 2000.13 had a "sunset date" of September 2005,

1 but its policies were thereafter incorporated into the Survey Manual, SM 445-2-H, which
2 is the USGS's authoritative policy manual.

### 2. WRD 84.57

The predecessor to WRD 2000.13, Water Resources Division Memorandum 84.57, dated February 3, 1984, also did not require marking of cables below 200 feet above the surrounding terrain but stated that "[r]ecent WRD Regional surveys identified 115 . . . cableways which might be hazardous to low-flying aircraft—not so much because of their height, but because of their location." (Leenhouts Decl., Ex. 7, WRD 84.57.) It further stated that because of increased use of helicopters, which have no minimum regulated flying altitude in uninhabited areas, the USGS "should consider marking those cableways which we feel may be potential hazards to low-flying aircraft— not as a regulatory requirement, but out of concern for the safety of our personnel who use the cableways as well as those people on board the aircraft." WRD 84.57 requested that each USGS District review its cableways and decide which may be hazardous to low-flying aircraft. It stated that "[a] plan should . . . be developed by each District to install markers on those cableways designated as potentially hazardous."

### 3. USGS Survey Manual: SM 445-2-H Chapter 27

The policies of WRD 2000.13 were incorporated into the USGS's policy manual, the Survey Manual. (Leenhouts Decl. ¶ 13.) SM 445-2-H addresses wire strike prevention for the USGS's own flights. (Leenhouts Decl., Ex. 3, USGS Manual, SM 445-2-H Ch. 27.) Like WRD 2000.13, SM 445-2-H states that the USGS's policy is to comply with FAA recommendations under FAR Part 77 "regarding establishment of an obstruction evaluation program and use of structural aircraft warning markers." USGS Survey Manual Appendix 27-8 copies verbatim from FAA Notification Requirements. (Leenhouts Decl., Ex. 4, USGS Manual, App. 27-8.) It states that notice shall be provided to the FAA Administrator for "[a]ny construction or alteration of more than 200 feet in height above ground level at its site." (App. 27-8.)

### 4. Discretionary Factors

To determine whether cableways need to be marked, the USGS Arizona Water Science Center looks first to USGS policy. (Leenhouts Decl. ¶ 32.) With regard to the cableway that is the subject of this lawsuit, neither USGS nor FAA policy required marking of the cable or submission to the FAA for an aeronautical study. (Leenhouts Decl. ¶ 32.) While the relevant policies do not require the marking of any of the 58 cableways within the jurisdiction of the USGS Arizona Water Science Center, 11 of those cableways have warning markers. (Leenhouts Decl. ¶ 32.) The USGS balances a variety of factors—many of which are site-specific—in determining whether to mark a cableway even when the relevant policies do not require marking. (Leenhouts Decl. ¶ 32.)

The USGS found that a variety of factors counseled against marking the subject cableway, including: (a) marking cables that are ordinarily too low to mark under FAA regulations may create "unintended hazards to air traffic;" (b) no record exists of a prior accident involving the subject cableway since its installation in 1934; (c) the cableway is "below FAA recommended elevations for aircraft," and helicopters that fly below 500 feet above ground are required to do so without creating a hazard to persons or property on the surface; (d) cableway installation "imposes a financial burden on the government;" (e) cableway installation over a river involves "an element of physical risk to employees;" (f) marking cables that are ordinarily too low to mark under FAA regulations may confuse pilots; (g) warning markers attract vandals such as marksmen who try to shoot the markers from the cable, and such vandalism may cause damage to the primary cable and place employees' safety in peril when using the cableway; and (h) warning markers require regular maintenance, particularly in light of the frequency of vandalism. (Leenhouts Decl. ¶ 33.)

### C. Other Policy Considerations

The USGS must also balance the factors regarding marking cableways with the priorities of the land-management agency responsible for the land on which the cableway is to be installed. (Leenhouts Decl. ¶ 34.) The Verde River canyon, in which the crash

1  occurred, is located in the Prescott National Forest, which is managed by the USFS, part
2  of the Department of Agriculture. (Leenhouts Decl. ¶ 9.) Congress designated portions of
3  the Verde River as a Wild and Scenic River in the Arizona Wilderness Act of 1984,
4  Public Law 98-406. (Leenhouts Decl. ¶ 34.) Pursuant to the Act, "the U.S. Department of
5  Agriculture developed the Verde Wild and Scenic River Comprehensive River
6  Management Plan [CRMP] to establish 'a comprehensive approach to managing the free-
7  flowing natural character of the river and its values.'" (Leenhouts Decl. ¶ 34 (quoting
8  CRMP).) The CRMP identifies 51 threatened, endangered or special-status species within
9  the river corridor, and a Bald Eagle Nesting Area, which is noted on maps, is located in
10 the area of the subject cableway. (Leenhouts Decl. ¶ 34.) As a result, with regard to
11 deciding whether to mark a cableway, "low-flying aircraft are not anticipated through the
12 area." (Leenhouts Decl. ¶ 34.)

13 Moreover, the subject cableway is located in an area that the CRMP identifies as a
14 Wild and Scenic Corridor, which receives the highest amount of management by the
15 USFS for scenic values. (Leenhouts Decl. ¶ 34.) The CRMP calls for the reduction or
16 elimination of visual distractions to meet scenic integrity objectives, and "researchers and
17 cooperators" such as the USGS must take scenic values into consideration when placing
18 anything into the river corridor, including gaging stations, cableways, fences and power
19 lines. (Leenhouts Decl. ¶ 34.) Indeed, when the USGS planned to reinstall the cableway
20 after the subject crash, the USFS asked that the cableway be camouflaged with the native
21 surroundings. (Leenhouts Decl. ¶ 34.)

22 **II.     LEGAL STANDARDS**
23      **A.     Dismissal for Lack of Subject Matter Jurisdiction**
24 "A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)
25 may attack either the allegations of the complaint as insufficient to confer upon the court
26 subject matter jurisdiction, or the existence of subject matter jurisdiction in fact."
27 *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill*
28 *Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "Where the

jurisdictional issue is separable from the merits of the case, the [court] may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill*, 594 F.2d at 733; *see also Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("With a 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction."). The burden of proof is on the party asserting jurisdiction to show that the court has subject matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

"[B]ecause it involves a court's power to hear a case," subject matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513-14 (2006).

### B.     Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." A Rule 12(c) motion is functionally identical to a Rule 12(b) motion to dismiss for failure to state a claim, and the same legal standard applies to both motions. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Specifically, a complaint must include "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also* Fed. R. Civ. P. 8(a). A dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (citations omitted). The complaint must thus contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### C. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

### III. ANALYSIS

In its Motion, the United States argues that the Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction because they are barred by the doctrine of sovereign discretionary immunity. (MTD at 1.) The United States also argues that it is entitled to judgment on the pleadings because the basis of Plaintiffs' claims, Arizona tort law, is preempted by certain FAA regulations in this instance. (MTD at 1.) In their Motion, Plaintiffs argue that the Court should grant summary judgment to them on each of these questions. (MSJ at 1.) Because resolution of the question of sovereign discretionary immunity is dispositive in this case, the Court will limit its analysis to that question.

The FTCA generally authorizes suits against the United States for damages resulting from injury or loss of property, including serious personal injury or death, caused by the negligent or wrongful act or omission of any employee of the government acting within the scope of his or her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). An exception to this waiver of the United States' sovereign immunity arises under the doctrine of sovereign discretionary immunity as expressed in 28 U.S.C. § 2680(a), which provides that the United States shall not be liable for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984).

To determine whether sovereign discretionary immunity applies, the United States Supreme Court has prescribed a two-part test for determining whether a particular governmental act or omission is a discretionary function. *Berkovitz v. United States*, 486

1 U.S. 531, 536 (1988). First, a court must consider whether the governmental action "is a
2 matter of choice for the acting employee" and is therefore discretionary because it
3 involves an element of judgment. *Id*. at 536. An action cannot be discretionary when "a
4 federal statute, regulation, or policy specifically prescribes a course of action for an
5 employee to follow" because, "[i]n this event, the employee has no rightful option but to
6 adhere to the directive." *Id*.

7 Second, if the action involves an element of judgment, a court must determine
8 "whether that judgment is of the kind that the discretionary exception was designed to
9 protect." *Id*. The discretionary exception was designed to protect only those government
10 actions that were "based on considerations of public policy." *Id.* at 537. The "focus of the
11 inquiry is not on the agent's subjective intent in exercising the discretion . . . but on the
12 nature of the actions taken and on whether they are susceptible to policy analysis."
13 *United States v. Gaubert*, 499 U.S. 315, 325 (1991). Thus, to meet its burden to show the
14 sovereign discretionary immunity doctrine applies, the United States need not prove that
15 it actually considered policy factors in the particular act or omission; it need only show
16 that "these decisions are the type grounded in social, economic, or political policy
17 judgments." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir.
18 1989).

19 The United States argues that its decision not to mark the Verde River cableway
20 was discretionary because no statute, regulation, or policy specifically directed the USGS
21 to mark the cable and its decision not to mark the cableway is susceptible to policy
22 analysis and therefore the type of decision that the discretionary function exception was
23 designed to shield. (MTD at 11.) Plaintiffs argue that the USGS's decision not to mark
24 the cableway is not the kind of decision entitling the United States to immunity from suit
25 because it involved a safety—not public policy—decision arising from a condition the
26 USGS itself created by placing the cable across the Verde River canyon. (Resp. to MTD
27 at 5; MSJ at 11.) Plaintiffs contend that "the Government has not shown that its decision
28 not to mark cables is susceptible to any valid policy consideration." (Resp. to MTD at 8.)

**A.     Element of Judgment**

The general conduct under scrutiny in this case is the USGS's decision not to mark the cable it first placed over the Verde River canyon in 1934. With regard to the first element of the sovereign discretionary immunity test, the Court agrees with the United States that the evidence does not show that a statute, regulation or policy was in place at the time of the accident—June 30, 2012—requiring the USGS to mark the cable. As detailed above, the FAA did not require an aeronautical study or marking for an obstruction less than 200 feet above ground level (so long as the obstruction was not within certain distances from an airport or heliport). *See* 14 CFR § 77.9. The USGS policy regarding marking cableways mirrored the FAA regulations regarding airspace obstructions. *See* WRD 2000.13; SM 445-2-H. The Court disagrees with Plaintiffs' characterization that, by not requiring marking of cables below 200 feet, "the FAA does not regulate these cables." (Resp. to MTD at 5.) The FAA has jurisdiction over all airspace, and the fact that it established no requirement for the marking of cables below 200 feet does not mean it is not concerned with all airspace.

The evidence shows that the decision whether to mark the cableway required judgment on the part of the USGS, satisfying the first element of the sovereign discretionary immunity test. In the absence of a requirement for the marking of a cableway, the USGS has to consider a number of factors in making the decision. The United States proffers evidence that the USGS's aircraft safety considerations include whether to defer to FAA guidelines regarding marking obstructions to air space, including, for example, consideration of the fact that marking cableways may help pilots in certain instances but cause problems in others, in which pilots may be confused by a marker placed on an object below 200 feet above ground. Economic considerations are also present, including the cost to the USGS of installing and maintaining safety markers, particularly in light of the likelihood of vandalism. The USGS also assesses how foreseeable it is that an aircraft may hit a particular cableway by considering a number of factors, including the cableway's elevation below 200 feet above the ground, a helicopter

1 pilot's obligation to avoid obstacles when flying below 500 feet, any history of airstrikes
2 (in this instance, since 1934), and the infrequency of helicopters flying through certain
3 areas like a delineated Bald Eagle Nesting Area, among other factors. The USGS also
4 must consider the safety of its own employees, both with respect to installing and
5 maintaining warning markers on a cable strung over a river in national forest land and
6 with respect to the danger arising from damage to the cable from vandalism—by, for
7 example, shooting at the markers and hitting the cable—keeping in mind that the cable
8 must support USGS workers as they move over the river to complete their stream-gaging
9 tasks. And the USGS must consider the priorities of the agency in charge of managing the
10 land—in this instance, the USFS—including preserving scenic integrity pursuant to the
11 requirements of maintaining a Wild and Scenic Corridor under the Arizona Wilderness
12 Act of 1984.

13 Plaintiffs point to evidence that, after an earlier wirestrike accident, the USGS
14 issued memoranda requesting that the FAA and the Bureau of Reclamation "install
15 markers on cableways, regardless of height, to prevent more tragic fatal accidents."
16 (Resp. to MTD at 6.) Plaintiffs argue that "the Government's decision to leave all cables
17 unmarked and to defer to Part 77 regulations (that do not apply to USGS cableways) was
18 a decision based solely out of a desire to avoid additional lawsuits rather than protect the
19 safety of the public." (Resp. to MTD at 8.) Plaintiffs also assert that despite the existence
20 of several inspection reports that indicated the subject cableways should be marked, the
21 USGS failed to install markers. (Resp. to MTD at 9.)

22 Plaintiffs' evidence simply supports the conclusion that the decision whether to
23 mark cableways, including the one that caused the accident at the base of this lawsuit, is
24 discretionary, and the USGS has multiple factors to consider—many of them site-
25 specific—in making the decision. Although the USGS has occasionally revisited its
26 policy for marking cableways, it never decided to adopt a more stringent requirement
27 than what is required by the FAA.

28

13

1       **B.     Social, Economic and Political Policy**

2              With regard to the second element of the sovereign discretionary immunity test,
3       the USGS's reliance on FAA regulations pertaining to obstructions to air space in
4       deciding whether to mark a cableway is rooted in public policy. In *Mitchell v. United*
5       *States*, an analogous case, a crop duster airplane struck unmarked power transmission
6       ground wires installed by the Bonneville Power Administration (BPA). 787 F.2d 466,
7       468 (9th Cir. 1986). The Ninth Circuit Court of Appeals held that the BPA's decision
8       whether to mark ground wires was discretionary and, because the FAA is particularly
9       authorized by statute to regulate air safety, the BPA's "choice to leave air space safety
10      standards to be set chiefly by the FAA was 'grounded in social, economic, and political
11      policy'" and thus the type of agency decision that Congress sought to protect from
12      judicial review. *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 798 (1984)).

13             Among other cases, Plaintiffs cite *Sutton v. Earles* to argue that, because the
14      cableway was a known hazard for which the USGS was responsible, the failure to mark it
15      was not the kind of policy decision the discretionary function exception was intended to
16      protect. 26 F. 3d 903, 910 (9th Cir. 1994). In *Sutton*, boat passengers were injured and
17      killed when the boat hit an unmarked mooring buoy placed by the Navy. *Id.* at 906-907.
18      But, in making its decision not to mark the buoy in that case, the Navy did not defer to
19      the regulation of another agency responsible for regulating obstructions to navigation, as
20      the USGS did by relying on FAA regulations in this instance and the BPA did in
21      *Mitchell*.[1] The USGS's choice to defer to the air safety standards set by the FAA, the
22      agency statutorily charged with regulating navigation safety in all airspace, is the type of
23      discretion that is grounded in social, economic and political policy. *See Mitchell*, 787

---

[1] In *Sutton*, while the Navy complained that it should not be liable when the Coast Guard, who had discretion to mark obstructions to water navigation, never marked the buoy, 26 F.3d at 911, that is quite different from the present case, in which the USGS relied on a specific FAA regulation regarding when obstructions to air navigation should be marked or considered for marking, which regulation was adopted by the agency responsible for controlling all airspace—including that through which Mr. Perry's helicopter flew.

F.2d at 468; *Weiss v. United States*, 889 F.2d 937, 939-40 (10th Cir. 1989) (concluding that USFS's decision to adopt the FAA policy regarding marking of obstructions to air space below 500 feet was an exercise of discretion subject to the discretionary function exception); *Mellott v. United States*, 808 F. Supp. 746 (D. Mont. 1992).

Because Plaintiffs' claims arise from acts subject to the discretionary function exemption to the government's waiver of its sovereign immunity in the FTCA, the Court lacks subject matter jurisdiction over those claims. The Court thus does not address the second question posed by the parties: whether the state law basis of Plaintiffs' claims is preempted by federal regulation.

IT IS THEREFORE ORDERED granting Defendant United States' Motion to Dismiss Plaintiffs' Complaint and/or for Judgment on the Pleadings (Doc. 36) and dismissing Plaintiffs' claims against the United States for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED denying Plaintiffs' Motion for Partial Summary Judgment (Doc. 37).

IT IS FURTHER ORDERED directing the Clerk of Court to enter judgment accordingly and close this case.

Dated this 6th day of January, 2017.

Honorable John J. Tuchi
United States District Judge